IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 09-cv-01646-PAB-MJW

GEORGE SISNEROS,

    Plaintiff,

v.

OFFICE OF PUEBLO COUNTY SHERIFF,
KIRK M. TAYLOR, Pueblo County Sheriff,
PUEBLO COUNTY SHERIFF'S DETENTION CENTER,
JOHN and JANE DOE deputies and employees, (to be later specifically identified) of Pueblo County Sheriff and Detention Center,
CORRECTIONAL HEALTHCARE MANAGEMENT, INC., a corporation authorized to conduct business in the State of Colorado,
JOHN DOE (to be later specifically identified), individually and in his capacity as an agent or employee of Correctional Healthcare Management, Inc.,
JANE DOE (to be later specifically identified), individually and in her capacity as an agent or employee of Correctional Healthcare Management, Inc.,
JOHN/JANE DOE, physicians and medical treatment providers (to be later specifically identified) at the Pueblo County Sheriff's Detention Center,
CITY OF PUEBLO,
JAMES W. BILLINGS, JR., Chief of Police of Pueblo,
OFFICER RONALD M. ORESKOVICH,
CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a St. Mary-Corwin Medical Center of Pueblo, Colorado,
PETER ELLIOTT, M.D., and
JOHN/JANE DOE physicians and medical treatment providers (to be later specifically identified) at St. Mary-Corwin Medical Center,

    Defendants.

**ORDER**

This matter is before the Court on the motion for summary judgment [Docket No. 139] filed by defendant Ronald Oreskovich. Oreskovich asserts the defense of qualified immunity in response to plaintiff's excessive force claim against him. The motion is fully

briefed and ripe for disposition.

## I. BACKGROUND

The following facts, unless otherwise indicated, are not in dispute. On July 18, 2007 at around 11:00 a.m., plaintiff began drinking in an alley in Pueblo, Colorado. After drinking a 40-ounce bottle of beer, plaintiff entered the East Side Tavern, where he drank "a couple of beers." Docket No. 139 at 3, ¶ 4; Docket No. 153 at 2. Upon leaving the East Side Tavern, plaintiff and a friend purchased more alcohol and went to the friend's house to drink it. Plaintiff returned to the alley near the East Side Tavern sometime before 10:00 p.m. that evening and may have passed out in the alley for some period of time upon his return.

Shortly before 10:00 p.m. that evening, an unidentified man offered plaintiff a two-inch folding knife. Plaintiff, who was still intoxicated at the time, put the knife in his pocket and then attempted to enter the East Side Tavern. Dwayne Williams, who worked at the East Side Tavern, would not permit plaintiff to enter the bar, at which time plaintiff pulled out the knife and pointed it at Mr. Williams. Mr. Williams went back inside the East Side Tavern, and plaintiff walked over to and leaned against a nearby liquor store.

Defendant Ronald Oreskovich, a police officer for the City of Pueblo, was on duty on the evening of July 18, 2007, wearing a full police uniform and driving a marked police vehicle. Shortly after 10:00 p.m. that evening, Oreskovich received a dispatch that plaintiff was "in the [East Side Tavern] parking lot with a knife." *See* Docket No. 153 at 2, ¶ 15. Oreskovich was only a few blocks away at the time and began driving in the direction of the East Side Tavern. Fellow officer Donnie Lambert was also on duty

2

that evening, heard the same dispatch, and responded to the location. Oreskovich testified that he and Lambert "knew [plaintiff] to have been violent in the past," Docket No. 153 at 2, ¶ 16, though plaintiff had always been compliant with them. After the dispatch went out, a Pueblo Police Department sergeant told officers over the radio to be careful because plaintiff was capable of using the knife.

Oreskovich arrived at the East Side Tavern shortly after receiving the initial dispatch and saw plaintiff holding a paper bag in his hand in which he assumed there was a beer can. Oreskovich claims that he also saw what he thought was a knife in plaintiff's left hand. In his response brief, plaintiff denies that he was holding the knife and argues that the knife was in his pocket. However, he cites to no record evidence supporting the fact that the knife was in his pocket at the time Oreskovich saw him standing against the wall of the liquor store. Rather, he cites his deposition testimony regarding putting the knife in his pocket after he was given it by the unidentified man, which was before he admittedly pointed the knife at Mr. Williams. See Docket No. 153-1 at 4 (Sisneros Depo. at 23, l. 8; 25, l. 14).[1] Upon arriving at the East Side Tavern, Lambert also recognized plaintiff and saw him holding something in a brown paper bag and clenching a dark object in his left hand.[2]

---

[1]Plaintiff also relies on the affidavit of Sam Romo, who asserts that he saw plaintiff standing against the wall of the liquor store as Romo was going into the liquor store to buy a beer. See Docket No. 153-2 at 1, ¶ 8. Romo "did not see that Mr. Sisneros had anything in his hands." Id. at 1, ¶ 9. On his way out of the liquor store, Romo saw a police officer arrive and confront plaintiff. See id. at 2, ¶¶ 12-13. Romo does not state whether he saw anything in plaintiff's hands upon the arrival of the police. See id. at 2.

[2]Romo avers that "[n]one of the other police cars could have seen what had happened." Docket No. 153-2 at 2, ¶ 21. It is not clear whether this is limited to what

Oreskovich concluded, based upon the report that plaintiff was armed with a knife, that plaintiff was an imminent threat to both Oreskovich and others.[3] Oreskovich drew his firearm with his right hand and aimed it at plaintiff. He approached plaintiff while giving loud commands for plaintiff to drop what he had in his hand. Plaintiff did not comply. Rather, he turned so that his left hand was by his side, hidden from Oreskovich's view, and began walking away from Oreskovich.[4] Oreskovich believed that, if permitted to flee, plaintiff posed a continuing risk to himself and others. Therefore, Oreskovich "used his left hand to grab Sisneros by his right shoulder and forcefully push him to the ground." Docket No. 139 at 6, ¶ 32; Docket No. 153 at 3.[5] As

---

later occurred between Oreskovich and plaintiff or whether he contends that Lambert could not have seen plaintiff at all upon arriving on the scene. In any event, as already noted, plaintiff does not dispute that Lambert "saw that [plaintiff] was holding an unknown item inside a paper bag in his right hand and had a dark object clenched in his left hand." Docket No. 139 at 5, ¶ 25; Docket No. 153 at 3.

[3] Plaintiff contends that the circumstances did not justify Oreskovich's "subjective conclusions." Docket No. 153 at 3. He does not, however, deny that Oreskovich believed him to be armed with a knife.

[4] Romo describes plaintiff as leaning against the wall and being unresponsive to commands by Oreskovich for plaintiff to put his hands up. *See* Docket No. 153-2 at 2. Plaintiff contends that Lambert never saw plaintiff move. In the section cited by plaintiff, however, Lambert testifies that, "[a]t some point apparently [plaintiff] does [move], but I don't recall him moving. But he does at some point move away from the wall." Docket No. 153-5 at 3 (Lambert Depo. at 56, ll. 16-18); *see id.* at 60, ll. 18-20. In any event, plaintiff does not deny Oreskovich's assertion regarding what he saw. *See* Docket No. 139 at 6, ¶¶ 29-30; Docket No. 153 at 3 (disputing only the "subjective conclusions" reached by Oreskovich that are described in ¶¶ 27-31).

[5] Romo describes Oreskovich grabbing plaintiff by the back of his neck and "slamming [plaintiff] to the ground." Docket No. 153-2 at 2, ¶ 18. Although plaintiff relies upon the affidavit of Romo when making certain arguments, he does not dispute Oreskovich's description of the force he applied to plaintiff. *See* Docket No. 153 at 3.

plaintiff was falling to the ground, Oreskovich also saw a knife fall to the ground.[6] Oreskovich testified that plaintiff hit the ground "pretty hard." Docket No. 152-4 at 6 (Oreskovich Depo. at 111, l. 23); Docket No. 153-2 at 2, ¶¶ 19-20 (where Romo states that plaintiff hit the "ground real hard" and "the sound of his head hitting the ground was similar to the sound of a big boulder hitting the ground").

Oreskovich put his left knee on plaintiff's back to restrain him and grabbed his left hand. Lambert ran to where the two were on the ground and attempted to grab plaintiff's right hand, but plaintiff struggled with him. Oreskovich and Lambert eventually managed to handcuff plaintiff. When plaintiff stood up, Oreskovich saw blood on the ground underneath plaintiff's head and radioed a request for medical assistance. An ambulance transported plaintiff to the hospital.

After interviewing witnesses at the East Side Tavern, Oreskovich went to the hospital, intending to charge plaintiff with felony menacing. Upon arrival, Oreskovich learned that plaintiff had been treated for a laceration above his right eye. Medical personnel determined that plaintiff had a blood alcohol level of 0.336. At about 1:20 a.m. on July 19, 2007, the hospital cleared plaintiff for discharge, and Oreskovich transported him by wheelchair to his patrol car. A nurse helped plaintiff get in the back seat with his hands cuffed in front of him. Oreskovich called ahead to the Pueblo County Sheriff's Office Detention Center to inform them that plaintiff would need assistance getting out of the patrol car. Oreskovich and plaintiff arrived at the detention center shortly after 1:30 a.m., where multiple sheriff's deputies removed plaintiff from

---

[6] Lambert avers that, "[a]s [plaintiff] fell to the ground, he dropped a dark-colored handled knife." Docket No. 139-2 at 3, ¶ 12.

the car and transported him into the jail. Oreskovich then went into the facility to fill out paperwork before returning to his patrol duties.[7]

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

---

[7]Thereafter, according to the plaintiff's complaint, either an employee of the Detention Center or of Correctional Healthcare Management, Inc. (an entity plaintiff alleges the County of Pueblo hired to provide medical services in the Detention Center) threw plaintiff to the floor of his cell. As a result, plaintiff suffered a laceration on his left eyebrow and, therefore, was returned to the hospital. According to plaintiff, when he returned to the Detention Center, he was again thrown to the floor of his cell and left unattended. Plaintiff was later diagnosed with a central spinal cord injury and is now permanently paralyzed.

**III. DISCUSSION**

Plaintiff brings a claim for excessive force in violation of the Fourth Amendment against defendant Oreskovich.[8] To succeed on a section 1983 excessive force claim, a plaintiff must establish a deprivation of a federal right by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). There is no dispute that Oreskovich was acting under color of state law. The focus, therefore, is on whether Oreskovich deprived plaintiff of a federal right.

In response to plaintiff's claim that he used excessive force, Oreskovich asserts the defense of qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008). Until recently, the plaintiff was required to "first establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran,* 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185 (10th Cir. 2001)). The determination of whether a violation occurred under the first prong of the

---

[8]The Fourth Amendment applies to state actors by way of incorporation into the due process clause of the Fourteenth Amendment. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). For ease of reference going forward, the Court will refer only to the Fourth Amendment.

7

qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights,* 509 F.3d 1278, 1282-83 (10th Cir. 2007). After establishing that threshold question, the plaintiff must establish that the identified right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

The Supreme Court recently altered the qualified immunity analysis by holding that the "mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 817 (2009). Instead, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 129 S.Ct. at 818. Here, the Court will first address whether Oreskovich violated a constitutional or statutory right.

The Fourth Amendment provides that the "right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . shall not be violated." U.S. Const. amend. IV. A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's freedom of movement through means intentionally applied. *See Brower v. County of Inyo,* 489 U.S. 593, 596-97 (1989); *Scott v. Harris,* 550 U.S. 372, 381 (2007). There is no dispute that Oreskovich seized plaintiff. The issue before the Court is whether the seizure was unreasonable.

Excessive force can render a seizure unreasonable. The Court must "analyze whether the force used to effectuate an arrest violates an individual's Fourth

Amendment rights under the 'objective reasonableness' standard of the Fourth Amendment." *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1220 (10th Cir. 2005) (citing *Graham v. Connor,* 490 U.S. 386, 388 (1989)).  That analysis is conducted "from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Buck v. City of Albuquerque,* 549 F.3d 1269, 1287-88 (10th Cir. 2008) (quoting *Marquez,* 399 F.3d at 1220).  In taking up a motion for summary judgment, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness" determination becomes "a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original).

As an initial matter, plaintiff argues that the Court, when assessing the objective reasonableness of the force applied in this case, should consider Oreskovich's actions to constitute deadly force.  "Deadly force is such force that creates a substantial risk of causing death or serious bodily harm," *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quotation marks, alteration marks, and citation omitted), and may only be used "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quotation marks, citation, and emphasis omitted).  Plaintiff characterizes the force used in this case as consisting of Oreskovich "grabbing [plaintiff's] neck and using it to drive

[plaintiff] into the ground, face first." Docket No. 153 at 15.[9]  The Court need not determine whether forcefully directing plaintiff's head toward the ground constitutes deadly force because plaintiff cites no evidence that is what occurred in this case.  *See Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) ("[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . .") (internal citations omitted). Rather, the undisputed evidence indicates that Oreskovich grabbed plaintiff by either the shoulder or neck and pushed him forcefully to the ground.  While it is undisputed that plaintiff's head hit the ground with great force, there is no evidence that was anything other than an unintended consequence of Oreskovich forcefully pushing plaintiff to the ground so as to detain him, rather than an objectively substantial risk inherent to the specific force applied.  *Cf. McCracken v. Freed*, 243 F. App'x 702, 710 (3d Cir. 2007) (concluding that, "[e]ven though pepper spray is a dangerous chemical which causes severe pain and can, in some cases, lead to serious injury, it is not deadly force") (citation omitted); *Foote v. Dunagan*, 33 F.3d 445, 449 (4th Cir. 1994) (finding that the "attempt to grab [plaintiff's keys] and pull him from [an] almost-stationary truck to prevent him from driving off . . . . did not . . . constitute the use of deadly force").  Such conduct, while having the potential to result in serious bodily

---

[9]Plaintiff states in his response brief that "he has been a quadraplegic [sic] ever since."  Docket No. 153 at 15.  Plaintiff, however, alleges that other defendants applied significant force to him in the hours after his interaction with Oreskovich and does not identify evidence in response to the present motion showing that his spinal cord injury resulted from Oreskovich's actions.

injury, does not, as an objective matter, "create[] a substantial risk" of such injury.[10] *See Guseman by Guseman v. Martinez*, 1 F. Supp. 2d 1240, 1259 (D. Kan. 1998) ("Almost any type of force can cause death in aberrant circumstances. The limits on the use of 'deadly force' under the Fourth Amendment, however, apply only to 'that force which is reasonably likely to cause death.'") (citation omitted); *see also Kanda v. Coeur d'Alene Police Chief Wayne Longo*, 2010 WL 3000678, at *6 (D. Idaho July 27, 2010) ("While there is a risk of bodily injury that would result from a person hitting their head against an iron railing as part of a takedown, the Court is not convinced that this level of force rises to the most serious level of force that a police officer could employ."). Viewing the facts in the light most favorable to plaintiff, Oreskovich used some measure of intermediate or less-than-deadly force against plaintiff when he brought him to the ground.[11]

The Court finds that the use of such force under the circumstances was objectively reasonable. "Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

[10]There is some question about whether there is a subjective component to the "deadly force" determination. *See Thomson*, 584 F.3d at 1313 n.3. Here, however, plaintiff does not cite any evidence that Oreskovich intended for plaintiff's head to hit the ground first.

[11]Furthermore, even assuming the record supported plaintiff's characterization, the use of force still would likely be deemed less than deadly. *Sheridan v. Trickey*, 2010 WL 5812678, at *5 (D. Or. Dec. 16, 2010) ("Viewing the evidence in a light most favorable to Sheridan, the relevant quantum of force is the slamming of Sheridan's head against the asphalt with sufficient force to knock Sheridan unconscious and to fracture his face. Although not deadly force, the force is at least intermediate level force.").

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir. 2008) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). In addition to such justifications for the use of force, the Court must also consider "the degree of force . . . used to effect it." *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007).[12]

In this case, Oreskovich was presented with a situation where, at a minimum, he had reason to believe plaintiff had been involved in "a disorderly situation," Docket No. 153 at 13, and was armed with a knife. Upon arriving on the scene, Oreskovich contends he saw plaintiff holding the knife in his left hand. Plaintiff argues that the knife was in his pocket, but offers no evidence supporting that contention. He relies on the affidavit of Sam Romo, who asserts that he saw plaintiff standing against the wall of the liquor store prior to Oreskovich's arrival. *See* Docket No. 153-2 at 1, ¶ 8. Romo "did not see that Mr. Sisneros had anything in his hands." *See* Docket No. 153-2 at 1, ¶ 9. It is undisputed, however, that plaintiff had a brown paper bag in one hand, and plaintiff does not dispute that Officer Lambert "saw that [plaintiff] was holding an unknown item inside a paper bag in his right hand and had a dark object clenched in his left hand." Docket No. 139 at 5, ¶ 25; Docket No. 153 at 3. Nor does plaintiff dispute that Oreskovich "began giving loud commands for him to drop whatever [plaintiff] had in his

---

[12]Plaintiff cites *Cortez*, 478 F.3d at 1127, for the proposition that, "if a police officer lacks probable cause to perform an arrest, then all of the force used to affect [sic] an arrest is excessive." Docket No. 153 at 7. The Court in *Cortez*, however, made clear that "in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." *Cortez*, 478 F.3d at 1126. Plaintiff has not asserted a false arrest claim against Oreskovich.

hand." Docket No. 139 at 6, ¶ 29; Docket No. 153 at 3 (disputing only the "subjective conclusions" reached by Oreskovich that are described in ¶¶ 27-31). In any event, Mr. Romo does not state whether he saw anything in plaintiff's hands upon the arrival of the police. *See* Docket No. 153-2 at 2. Based on that record, the Court finds that there is no genuine dispute of material fact that Oreskovich saw what he believed to be a knife in plaintiff's left hand. *Cf. Estate of Larsen*, 511 F.3d at 1261 ("[T]he 'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'") (citation omitted). Upon seeing the knife and while approaching plaintiff, Oreskovich ordered plaintiff to drop what was in his hand or, in Mr. Romo's account, to put his hands up. It is undisputed that plaintiff did neither. *Cf. Chidester v. Utah County*, 268 F. App'x 718, 727 (10th Cir. 2008) (concluding that tackling plaintiff was unreasonable where officer was "faced with a compliant suspect whose hands were above his head"). It was reasonable for Oreskovich then to use the degree of force necessary to put plaintiff in a position where plaintiff could not as easily swing a knife at Oreskovich (i.e., on the ground) while at the same time minimizing the amount of time Oreskovich was in close proximity to plaintiff.

Plaintiff admits that, at the time he failed to comply with commands, Oreskovich had already "learned over the radio dispatch that [plaintiff] was likely armed and potentially dangerous." Docket No. 153 at 14. He argues, however, that "this basis to believe [he] was potentially armed and dangerous supplied no more than constitutional justification for a 'frisk' or 'pat down search' of [plaintiff's] outer clothing." Docket No.

13

153 at 14. Plaintiff does not explain how Oreskovich would have been able to safely conduct such a frisk of plaintiff, who failed to respond to Oreskovich's commands, without unreasonably risking having plaintiff stab him, intentionally or otherwise, while doing so. *Cf. Estate of Larsen*, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'") (citation omitted). In any case, the possibility that Oreskovich "could have accomplished the arrest using a less forceful takedown maneuver," *Sheridan v. Trickey*, 2010 WL 5812678, at *7 (D. Or. Dec. 16, 2010), does not mean the maneuver he used was objectively unreasonable. *See id.* (noting that "other means for subduing or controlling [plaintiff] would have required comparable or greater force and risk, such as use of tasers or guns, or by kicking or punching").[13] That plaintiff might now be able to identify less-forceful alternatives does not, without more, establish that the conduct was unreasonable at the time. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quotation marks and citation omitted). Because the Court finds that plaintiff has not identified facts supporting the conclusion that his constitutional right to be free of excessive force was violated, defendant is entitled to summary judgment on plaintiff's Fourth Amendment claim of excessive force.

---

[13]Nor does the fact that plaintiff suffered a laceration to his head inevitably mean that the force was excessive. *See Giese v. Wichita Police Dept.,* 69 F.3d 547 (table), 1995 WL 634173, at *2 (10th Cir. 1995) ("When plaintiff, as a suspect, was shown the police officers' credentials and ordered into a police car, and he decided to run, it was not the application of constitutionally excessive force when the officers ran after and tackled him. Further, that plaintiff's arm was broken when he was tackled does not by itself show any fault of the police officers.") (citation omitted).

14

Plaintiff also brings a state law claim against Oreskovich alleging assault, battery, brutality, and outrageous conduct. Oreskovich seeks summary judgment on that claim pursuant to the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. § 24-10-101 *et seq.*, which provides that public entities and employees, which include police officers, are immune from torts unless the act or omission giving rise to liability was "willful and wanton." Colo. Rev. Stat. § 24-10-105(1). The phrase "willful and wanton" is not defined in the CGIA, but "the Colorado Supreme Court looked to the definition of 'willful and wanton' for purposes of exemplary damages ('conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff') and the definition of 'willful and wanton' used in the automobile guest statute (as 'wholly disregardful of the rights, feeling and safety of others . . . at times even imply[ing] an element of evil')." *Twitchell v. Hutton*, No. 10-cv-01939-WYD-KMT, 2011 WL 318827, at *7 (D. Colo. Jan. 28, 2011) (quoting *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1991)); *see Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1141 (D. Colo. 2001) (distilling the definition of "willful and wanton" to "purposefully pursued a course of action or inaction that he or she considered would probably result in the harm" to plaintiff). A showing that Oreskovich's conduct was "not objectively reasonable [] is not sufficient to establish willful and wanton conduct." *Strachan v. City of Federal Heights, Colo.*, 837 F. Supp. 1086, 1092 (D. Colo. 1993); *see Rivers v. Alderden*, No. 05-CV-00766-PSF-MEH, 2006 WL 686568, at *8 (D. Colo. March 17, 2006) (concluding "that defendants were not unreasonable in determining

that probable cause existed to arrest [plaintiff], and the relevant disputed facts listed by [plaintiff], viewed in the light most favorable to her, are insufficient to raise a genuine issue of material fact as to whether defendants acted willfully or wantonly").[14]  Here, plaintiff has not shown that Oreskovich's conduct was objectively unreasonable and, therefore, Oreskovich is entitled to summary judgment on plaintiff's state law claim as well.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Oreskovich's motion for summary judgment [Docket No. 139] is GRANTED and that plaintiff's claims against defendant Oreskovich are dismissed.

DATED March 10, 2011.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[14] Additionally, plaintiff must show that Oreskovich "subjectively realized that [he was] acting recklessly." *Strachan*, 837 F. Supp. at 1092 (emphasis omitted).